OPINION OF THE COURT
Leon Ruchelsman, J.
*323 The defendant has filed a motion seeking to preclude the expert testimony offered by the plaintiff and for summary judgment pursuant to CPLR 3212 on the grounds that the plaintiff cannot succeed on the claims alleged. The plaintiff opposes the motion seeking preclusion and has cross-moved seeking summary judgment arguing that there is no dispute that the plaintiff is entitled to judgment. Papers were submitted by both parties and arguments held. After reviewing the papers of the parties, including the medical affidavits submitted this court now makes the following determination.
Background
This lawsuit was filed against the defendant, the maker of Tylenol, alleging that normal dosage ingestion of Tylenol, and specifically acetaminophen, a significant component of Tylenol, caused her to develop cirrhosis of the liver which required a liver transplant in 2004. Following the exchange of significant medical discovery both parties move seeking summary judgment. The defendant presents essentially two arguments why the case should be dismissed. The first is that the plaintiff did not suffer from cirrhosis of the liver and that any case reports connecting cirrhosis and ingestion of acetaminophen, even if true and scientifically sound, are completely irrelevant. Moreover, the defendant argues that there is no scientifically acceptable evidence linking cirrhosis and acetaminophen and the plaintiff will simply be unable to prove this necessary causative element at triad. The plaintiff disputes both of these contentions and argues that the medical evidence submitted sufficiently demonstrates the causal link between acetaminophen and cirrhosis and that at least a Frye hearing should be held to further explore the issue.
Conclusions of Law
Summary judgment may be granted where the movant establishes sufficient evidence which would compel the court to grant judgment in his or her favor as a matter of law (Pucker-man v City of New York, 49 NY2d 557 [1980]). Summary judgment would thus be appropriate where no right of action exists foreclosing the continuation of the lawsuit.
It is well settled that expert testimony which involves novel scientific theories or techniques will be admissible at trial only upon a showing that such theories and such techniques are generally accepted within the scientific community (Frye v United *324 States, 293 F 1013 [DC Cir 1923]). As the court explained in People v Wesley (83 NY2d 417, 422 [1994]) “the test pursuant to Frye v United States (293 F 1013) poses the more elemental question of whether the accepted techniques, when properly performed, generate results accepted as reliable within the scientific community generally.” Thus, the conclusion reached need not be a consensus opinion since “general acceptance does not necessarily mean that a majority of the scientists involved subscribe to the conclusion. Rather it means that those espousing the theory or opinion have followed generally accepted scientific principles and methodology in evaluating clinical data to reach their conclusions” (Zito v Zabarsky, 28 AD3d 42, 44 [2d Dept 2006]).
These principles are equally applicable in cases such as the one at bar which concern a plaintiff attempting to prove that a certain drug caused a certain medical condition. To permit the medical expert evidence necessary to prove causation the plaintiff must submit relevant scientific data or studies showing such causal link (Hooks v Court St. Med., PC., 15 AD3d 544 [2d Dept 2005]). Therefore, in Blackwell v Wyeth (408 Md 575, 971 A2d 235 [Ct App 2009]) the court excluded expert testimony linking certain vaccines with autism finding that the tests conducted to prove that causal connection were methodologically flawed and unreliable. Similarly, in Ruggiero v Warner-Lambert Co. (424 F3d 249 [2d Cir 2005]), the court did not permit expert testimony seeking to establish a causal link between the ingestion of the drug Rezulin and cirrhosis of the liver since the court found there was no evidence to support such a link. The court held that the only link consisted of the plaintiffs doctor’s opinion based upon a differential diagnosis, in other words a process of elimination identifying the most likely cause from a list of possible causes. The court concluded that basis was insufficient to permit introduction of that medical testimony.*
Again, in Shepard v Barnard (949 So 2d 232, 32 Fla L Wkly D217 [Dist Ct App 2007]) the court refused to permit expert testimony linking the drug Verteporfin with photoallergy. In that case the only evidence linking the two was the testimony of *325 the doctor who based his opinion solely upon the “temporal relationship” between ingesting the drug and contracting the illness. The court held such scientific evidence failed to satisfy the Frye standard and excluded the evidence. New York cases likewise exclude scientific evidence where the methodology or techniques utilized are not accepted within the scientific community. In Selig v Pfizer, Inc. (290 AD2d 319 [1st Dept 2002]) the court excluded testimony demonstrating a link between the drug Viagra and heart attacks. The court found that studies were not conducted with Viagra itself but a similar drug with important medical differences. Moreover, a study submitted on the subject did not draw any conclusions about the connection between Viagra and cardiac failure, only that further study was required. The court held such medical information insufficient to demonstrate causality and consequently the medical evidence was excluded. Similarly, in Kaczor v Vanchem, Inc. (262 AD2d 1041 [4th Dept 1999]) the court excluded expert testimony that chemical exposure caused chronic fatigue syndrome. The only evidence supporting such a link between the two was evidence from a doctor that fumes from chemical exposure cause increased liver enzyme levels which can cause chronic fatigue syndrome and that plaintiff had such increases in liver enzyme levels after the incident with the fumes. However, the doctor did not offer any basis to substantiate the assertion that high enzyme levels are caused by chemical fumes. Without any basis the evidence was excluded. Once again, in Lewin v County of Suffolk (18 AD3d 621 [2d Dept 2005]) the court excluded expert testimony attempting to link certain pesticides with birth defects. The court noted that the methodology used by the experts was speculative.
While the particular deficiencies which prompted the courts to exclude the expert evidence varied from case to case there was one overarching principle that underscored them all. In all the cases the methods utilized by the experts were not accepted within the scientific community and hence did not satisfy the Frye test.
These cases must be contrasted with those that held expert testimony admissible under Frye seeking to prove that a certain drug caused a specific injury. Thus, in Rodriguez ex rel. PossoRodriguez v Feinstein (793 So 2d 1057, 26 Fla L Wkly D1813 [Dist Ct App 2001]) the court permitted expert testimony linking exposure to certain drugs in útero as a cause of birth defects. Specifically, in that case the defendant prescribed the antifungal *326 drug Sporanox to treat a toenail fungus infection to a pregnant woman. When the child was born with an eye defect the doctor was sued for malpractice. Expert evidence was sought to be introduced linking ingestion of Sporanox as a cause for the birth defects. The conclusion of the three experts was based upon seven factors enumerated by the court. They included
“(1) the timing and duration of the exposure to the drug; (2) the lingering effect of the drug in the system even after the patient stops taking it due to the drug’s lipophilic aspect (attraction to the fatty tissue); (3) the drug’s molecular weight which is small enough to be transferred through the placenta; (4) the Federal Drug Administration’s classification of the drug as a category C drug, teratogenic in animals; (5) the manufacturer’s package insert which warns against taking this particular drug during pregnancy; (6) animal studies which have shown the drug to cause birth defects; and (7) the statistical increase in birth defects according to FDA adverse reaction reports.” {Id. at 1058-1059.)
The court concluded that the scientific views expressed by plaintiffs experts were accepted within the scientific community and the fact the conclusions differed from those of defendant’s experts did not mean they were unreliable. Thus, the court admitted the expert testimony.
However, an important clarification of the Frye standard was developed in Nonnon v City of New York (32 AD3d 91 [1st Dept 2006]) and cases which followed. In that case the court conceded that epidemiological studies were not novel and hence did not require Frye analysis. The court defined epidemiology as “a science which focuses on the question of general causation (i.e., is the [landfill] capable of causing disease?) rather than that of specific causation (i.e., did [the landfill] cause disease in a particular individual?)” (id. at 112 [internal quotation marks and citations omitted]). Thus, “this field of science is the primary generally accepted methodology for demonstrating a causal relation between a chemical compound and a set of symptoms or a disease” (id. at 104 [internal quotation marks and citations omitted]). The court found that the experts engaged in standard scientific procedure and methodology and reached acceptable conclusions. Therefore, the court permitted expert evidence linking carcinogens found at a landfill causing injuries to plaintiffs. In Marso v Novak (42 AD3d 377 [1st Dept 2007]) the court refined its earlier pronouncement in Nonnon. In Marso, *327 the plaintiff suffered a stroke and sued his doctor claiming the stroke was caused by a slow heart rate (bradycardia) which his doctor failed to address. Indeed, the plaintiff sought to introduce expert testimony that the stroke was caused by bradycardia, although the expert conceded that there was no acceptance within the scientific community that a stroke is a risk factor of bradycardia. The conclusion reached by the expert was therefore based upon a differential diagnosis, a process of elimination which excludes all other causes. The court rejected the reading of Nonnon as permitting the introduction of any expert evidence provided the methodology is acceptable. The court stated that the
“[p]laintiff interprets Nonnon to mean that generally accepted methodology such as differential diagnosis when properly performed leads to admissible expert conclusions. This case prompts us to add ‘but not when there is a generally or widely held view in the scientific community rejecting such conclusions outright.’ In this case, plaintiff’s expert’s own unambiguous answer at trial was that the result generated, which purportedly confirmed the expert’s initial theory, was not accepted in the medical community.” (Id. at 378.)
Thus, methodology, standing alone, cannot confer acceptance. What Frye demands is a scientific “theory” which incorporates methodology, technique and conclusions which are basically accepted within the scientific community. As noted, there need not be an overwhelming consensus regarding the conclusions reached, but if the conclusions are not deemed acceptable within the scientific community, methodology alone will not satisfy the requirements of Frye.
Applying those principles to this case, therefore, requires an examination of the evidence presented by the parties. The defendant satisfied its burden demonstrating that there is no scientific evidence linking acetaminophen with cirrhosis. Such evidence consists of an affidavit of Dr. Howard Worman, an expert in the field of hepatology, wherein he states that there are no scientific peer studies that link acetaminophen with cirrhosis. He further states that indeed there is no evidence linking the two and that the experts supplied by the plaintiff purporting to do just that are flawed and without acceptance within the scientific community.
In opposition, the plaintiff has submitted various expert affidavits that will now be examined. Plaintiff submitted an affi *328 davit from Dr. Douglas Dieterich, a hepatologist. He stated that there is no dispute concerning the hepatotoxicity of acetaminophen. That means there is no dispute that acetaminophen has the ability to cause liver cell death. However, he cautioned that it is dose-dependant and that its toxic effects can only be manifested at doses greater than those recommended for standard use. Indeed, Dr. Dieterich cited to a recent notice promulgated by the Food and Drug Administration conceding that there is scientific agreement that ingestion of acetaminophen could lead to liver disease. The Food and Drug Administration noted that there is little agreement concerning the “specific threshold dose for toxicity” and in conformance with the findings recommended a reduction of the daily adult dosage from 4,000 milligrams per day to 3,250 milligrams per day. Thus, Dr. Dieterich concluded that there is no disagreement that acetaminophen can cause liver disease. Dr. Dieterich further opined that whether the liver disease is acute or chronic does not have any bearing upon the cause of the disease and is thus only a function of its duration and that long-term exposure to toxins or other drugs can cause cirrhosis. Further, Dr. Dieterich explained that this conclusion is not new but has been recognized for many years. Further, Dr. Dieterich introduced numerous case studies all purporting to show that the ingestion of acetaminophen can cause cirrhosis. Lastly, Dr. Dieterich stated that a differential diagnosis of the plaintiff leads to the conclusion that the ingestion of acetaminophen caused the cirrhosis.
However, as noted, there must be acceptance of this theory within the scientific community. As the court stated in Matter of Neurontin Prod. Liab. Litig. (24 Misc 3d 1215[A], 2009 NY Slip Op 51459[U], *7 [Sup Ct, NY County 2009]) “[a]n expert opinion on causation will be excluded where it is unsupported by any scientific studies or medical literature or where the literature is plainly insufficient to support the opinion.” There are no studies or medical literature which conclude that the ingestion of normal doses of acetaminophen causes cirrhosis. There are numerous studies and a reasonable medical consensus that doses greater than the recommended daily dosage can cause cirrhosis. Thus, Dr. Dieterich attempts to draw a medical parallel between proper doses and greater doses of acetaminophen to conclude that acetaminophen causes cirrhosis. However, that theory is not accepted within the scientific community.
First, it is widely agreed that ingestion within the recommended dosages is safe. Dr. Dieterich himself agrees with this *329 assessment. He states “acetaminophen is known to be a dose-dependent (or overt) hepatotoxin, whose acutely toxic effects can be seen at doses that are only slightly greater than recommended therapeutic doses” (see affidavit of Dr. Dieterich 1Í 9). Dr. Dieterich attempted to prove that the recommended dosage was too high citing the Food and Drug Administration’s notice reducing the daily recommended dosage. However, the Food and Drug Administration did not conclude the dosage was too high because that dosage caused liver disease and had to be lowered to preserve the health of people ingesting acetaminophen. In fact, the notice conceded the recommended dosage as safe. The notice states that “taking more than the recommended amount [of acetaminophen] can cause liver damage, ranging from abnormalities in liver function blood tests, to acute liver failure, and even death.” Thus, admitting that taking more than the recommended dosage could prove fatal, the notice recounts the reality that such overdoses nevertheless take place. The notice explains that overdosing can occur for a number of reasons and detailed six distinct reasons why an overdose can occur. The first reason cited was the fact such overdoses were inadvertent. The notice further explained that tests revealed that even slight overdoses could prove unsafe and cited a study that found liver injury could occur where the doses were increased to between 5 and 71 /'z grams per day while the recommended amount was four grams per day. Thus, “recommended doses and table strengths of acetaminophen leave little room for error.” Another reason cited is that acetaminophen is found in so many products and someone ingesting multiple products that contain acetaminophen could potentially ingest more than the daily recommended amount. A similar reason cited concerned the fact that sometimes products do not adequately identify acetaminophen and therefore people overdose without even knowing they are overdosing. Another reason concerned liquid doses often given to children and mistakes that could be made since liquid doses contain different concentrations and hence parents could possibly administer overdoses without intending it. The last two reasons are of particular importance in this case. One concerned the fact that the public is simply uninformed about the dangers of increased ingestion of acetaminophen and, since they are uninformed, they do not appreciate the risks involved, and considering the marketing of products that contain acetaminophen they could overdose. The last reason offered stated that “some individuals may be especially sensitive to liver injury *330 from acetaminophen. The maximum safe dose may not be the same for all persons. Individuals with sensitivity may experience toxic effects at lower acetaminophen doses.” The reason offered concluded that individuals who consume alcohol “or have liver disease” may have a greater sensitivity to the effects of acetaminophen but that more research is needed to explain why some individuals are more sensitive.
Thus, the Food and Drug Administration never confirmed “Extra-Strength Tylenol use is dangerous to the liver” (plaintiff’s mem of law in opposition at 2). Rather, they concluded that ingesting overdoses of acetaminophen could prove dangerous and lowered the dosage for a variety of reasons as noted. The fact the Food and Drug Administration conceded that some individuals are particularly sensitive to liver disease does not mean there is a general acceptance within the scientific community that acetaminophen causes cirrhosis. In fact, the remainder of the Food and Drug Administration notice proves the very opposite conclusion. The notice continues and states that while the daily recommended dosage is being lowered a doctor may prescribe the old recommended dosage of four grams per day. It strains credulity that the Food and Drug Administration would permit doctors to prescribe a dosage, under any circumstances, that plaintiff claims poses serious health risks. In any event, there is clearly no scientifically accepted consensus which can be gleaned from the Food and Drug Administration’s notice that normal dosages of acetaminophen cause cirrhosis.
Concerning the case reports cited by Dr. Dieterich, almost of all them concern situations where the individual ingested doses that were far greater than the recommended daily dosage or suffered a disease other than cirrhosis, and even if case reports are an acceptable method of proof satisfying Frye’s requirement of general acceptance within the scientific community the case reports are completely irrelevant. There are only two case reports, those of Itoh and Johnson, which involved normal doses of acetaminophen and the development of cirrhosis. However, those case reports do not unequivocally state with any certainty that acetaminophen caused cirrhosis. Rather, both studies guardedly entertain the possibility that the liver injuries sustained are related to ingestion of normal doses of acetaminophen. That is simply an insufficient basis upon which to demonstrate acceptance within the scientific community.
In truth, these infirmities permeate the remainder of the affidavit of Dr. Dieterich. Isolated references or even whole sen *331 tences that are found in medical texts or journals which mention liver disease and acetaminophen and cirrhosis fail to ever state with any degree of medical certainty that normal dose ingestion of acetaminophen is a direct cause of cirrhosis. Lastly, differential diagnosis is likewise an insufficient basis upon which to establish that acetaminophen causes cirrhosis since, as noted, that is an insufficient basis upon which to prove causation {Ruggiero), especially where the totality of this theory has been shown not to be accepted within the scientific community.
The affidavit of Dr. Neil David Theise does not fare any better. Dr. Theise offers an insightful and readable affidavit concerning liver diseases and their causes with a focus upon the plaintiff and the medical background tailored to her condition. First, Dr. Theise concedes that there are hardly any case reports which study consistent, normal dose ingestion, since that very combination is rare. Thus, Dr. Theise argues the facts related to the plaintiff are “uncommon” {see affidavit of Dr. Theise at 9). After explaining the relevant medical background necessary, Dr. Theise notes that in 1997 the plaintiff had a biopsy of her liver with no indications of fully developed cirrhosis, although it did reveal portal hypertension. At this time she had been ingesting normal doses of acetaminophen for 12 years. Four years later, in 2001 an MRI revealed cirrhosis. Dr. Theise opines that an examination of the cause of the cirrhosis suggested that hepatoportal sclerosis (HPS), a lesion affecting the smaller portal veins, must have been present in 1997 even though not evidenced in the biopsy, since how else to explain the portal hypertension. Dr. Theise then offers three ways to explain the existence of HPS as well as incomplete septal cirrhosis (ISC), a certain type of lesion now thought to signal the regression of cirrhosis, found following plaintiffs liver transplant in 2004. The first is that the lesions are independent unrelated diseases, the second that ISC is a late stage of HPS and are both a “single disease process” and third, that “HPS predisposes to subsequent development of cirrhosis; regression of cirrhosis follows if the etiology underlying the process is stopped or removed.” Dr. Theise eliminates the second cause as a possibility in this case and states as follows:
“according to explanation 1, the HPS was independent of the cirrhotic development and is a coincidental occurrence. According to explanation 3, the HPS actually potentiates the progression to cirrhosis. Either way, in the absence of any other known cause of cirrhosis and in the presence of a toxin with the *332 potential to cause chronic injury, the finding of both HPS and ISC in her liver does not undermine the likelihood that acetaminophen played a significant role in her endstage liver disease” (see affidavit of Dr. Theise at 30).
The problem with this conclusion is that it simply does not enjoy any acceptance within the scientific community. Indeed, novel scientific theories such as the one presented by Dr. Theise must be generally accepted for their admission in court. The court, of course, cannot and does not pass judgment upon the scientific methodology or conclusions of Dr. Theise. However, without evidence of wider acceptance of the theory proposed it cannot be admitted at trial. The affidavit of Dr. Theise, aside from the few sentences taken from larger texts, cannot demonstrate consensus concerning a “theory” and does not cite to any other peer articles or conclusions of any kind that state that normal ingestion of acetaminophen causes cirrhosis.
The affidavit of Gerald Rosen, Ph.D., a chemist and a pharmacologist, does not raise any issues concerning whether acetaminophen causes cirrhosis. First, Dr. Rosen chiefly opines that acetaminophen is not safe, causes liver failure and the pharmaceutical companies that manufacture acetaminophen refused to consider his patented alternatives that remove those threats. More importantly, in his 17-page affidavit he never once mentions cirrhosis or any relationship between acetaminophen and cirrhosis and does not discuss dosage levels, particularly normal dosages such as the case at bar. Thus, Dr. Rosen does not provide any expert support for the assertion that normal ingestion of acetaminophen causes cirrhosis.
Likewise, the affidavit of Dr. Suzanne Parisian does not mention cirrhosis at all. Dr. Parisian, a former medical officer of the Food and Drug Administration and an advocate of proper labeling of drugs and an investigator of adverse effects of drugs, opined concerning the health risks associated with acetaminophen and acute liver failure. She criticized the failure of the makers of acetaminophen to conduct proper testing to consider alternatives and the addition of other ingredients that would make acetaminophen safer. Moreover, many of her arguments against Tylenol and its “misleading practices” do not prove in any meaningful way at all that acetaminophen causes cirrhosis. They are policy arguments essentially directed at the marketing and research practices of Tylenol, not upon the medical connection, if any, between acetaminophen and cirrhosis. The closest the affidavit comes to linking the two is on page 20. There, Dr. Parisian notes that
*333 “the defendants provided warnings that certain conditions may be evidence of an overdose (e.g., nausea, vomiting, diaphoresis or general malaise), but never warned that liver toxicity could occur from ingestion of the recommended therapeutic doses, despite medical literature indicating that some people sustained liver injury while using therapeutic doses of Tylenol. Had such information been present, the plaintiff would have been able to recognize that the symptoms she was experiencing (weakness, fatigue, anorexia, nausea, vomiting, and pain) were caused by her prolonged Tylenol use.”
However, that analysis does not pinpoint the specific disease, namely cirrhosis, that plaintiff claims was caused by normal ingestion of acetaminophen. The reference to generic liver failure and general liver maladies do not necessarily involve cirrhosis and cannot serve as expert support and acceptance of the proposed theory of causation. As the court noted in Cinquemani v Old Slip Assoc., LP (43 AD3d 1096, 1098 [2d Dept 2007]), medical reports and affidavits that do not discuss the precise injury claimed are “irrelevant.” Furthermore, as previously noted, any medical literature that actually states that prolonged normal ingestion of acetaminophen causes cirrhosis are fleeting sentences in much larger passages which, although not taken out of context, are far less sweeping and definitive than urged by plaintiff. In any event they do not support a comprehensive theory that normal ingestion of acetaminophen causes cirrhosis. Any authoritative statements that seem to so indicate are small snippets of far larger and more complex discussions. Thus, the plaintiff has wholly failed to introduce any studies, peer articles, professional literature, judicial opinions or recognized textbooks that state plaintiff’s simple yet novel premise, namely that normal ingestion of acetaminophen causes cirrhosis to develop in the liver. Without that supporting material the plaintiff fails to satisfy the evidentiary requirements of the Frye standard. Consequently, the defendant’s motion seeking to dismiss the complaint and the case is granted. The plaintiffs motion is denied and the case is hereby dismissed.

 It should be noted that while Ruggiero was decided pursuant to the federal standard enunciated in Daubert v Merrell Dow Pharmaceuticals, Inc. (509 US 579 [1993]), the result would have been identical under the stricter Frye standard. A conclusion that no rational basis exists for admission of the evidence under Daubert would surely demand exclusion under Frye.